UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| S.J.G. ENTERPRISES, LTD. d/b/a S.J.G. & ASSOCIATES, Ltd., <br><br> Plaintiff, <br><br> v. <br><br> EIKENBERRY & ASSOCIATES, INC., <br><br> Defendant. | No. 04 C 1186 <br><br> Judge Nan R. Nolan |

## MEMORANDUM OPINION AND ORDER

Plaintiff S.J.G. Enterprises, Ltd. ("SJG") is suing Defendant Eikenberry & Associates, Inc. for an accounting and sales commissions allegedly due under the Illinois Sales Representative Act ("ISRA"), 820 ILCS 120/0.01 *et seq*. The matter is set for a jury trial on May 30, 2006. Defendant has filed motions in limine to bar the use of settlement discussions and settlement payments, and to exclude evidence of an oral contract with lifetime or perpetual duration. For the reasons set forth here, the motions are both denied.

### BACKGROUND

Defendant is an Indiana corporation engaged in the business of custom injection molding of plastic products. In 1984, Defendant entered into a verbal agreement with Stephen Gulyas, President of Illinois-based SJG, providing that SJG would represent Defendant as an independent sales agent in exchange for a certain percentage in sales commissions. This relationship continued without incident until October 2001, when Defendant terminated SJG as its sales representative. After that date, a dispute arose between the parties regarding Defendant's obligation to continue making commission payments to SJG. The parties exchanged numerous emails and other correspondence regarding this issue but were unable to reach a resolution. By April 2003, Defendant had stopped accounting to SJG for commissions on parts shipped to

customers secured by SJG, and in February 2004, SJG filed this diversity action against Defendant seeking an accounting and alleging violations under the ISRA.

Defendant seeks to exclude the parties' correspondence and discussions between October 2001 and May 2003, including evidence of commission payments made to SJG, claiming that they constitute settlement negotiations under FED. R. EVID. 408. Defendant also seeks to exclude evidence that the parties had an oral contract to pay commissions for a lifetime or perpetual duration. SJG denies that the documents, discussions, or payments constitute offers to compromise and argues that the evidence is admissible to establish Defendant's performance under the agreement sufficient to negate the Statute of Frauds.

## DISCUSSION

I.  **Motion to Bar Settlement Discussions and Payments**

Defendant argues that SJG's proposed exhibits 14 through 43 reflect offers of compromise regarding a disputed claim and are inadmissible under Rule 408. Rule 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

The primary purpose behind this rule is to encourage settlement negotiations, which might be chilled if offers of compromise may be used later as admissions of liability. *Zurich American Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005). The rule is not, however, an absolute ban on all evidence regarding settlement negotiations. Courts have admitted evidence of offers or agreements to compromise for purposes other than liability, such as to show bias or prejudice of a witness; rebuttal; impeachment; to show knowledge or intent; to show a continuing course of reckless conduct; and to prove estoppel. *Id.*; *Bankcard America, Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 484 (7th Cir. 2000). In deciding whether evidence should be excluded under

Rule 408, "courts must consider the spirit and purpose of the rule and decide whether the need for the settlement evidence outweighs the potentially chilling effect on future settlement negotiations." Id.

The parties dispute whether the exhibits in question actually constitute inadmissible settlement discussions under Rule 408. In making this determination, the court must consider whether "the statements or conduct were intended to be part of the negotiations for compromise." See, e.g., ICAP, Inc. v. Global Digital Satellite Sys., Inc., 225 F.3d 654 (4th Cir. 2000). For Rule 408 to be applicable, Defendant must make "a substantial showing" that the documents were, in fact, part of a settlement attempt. Raybestos Prods. Co. v. Younger, 54 F.3d 1234, 1241 (7th Cir. 1995). The parties' very first exchange documented in Plaintiff's Exhibit 14 does reflect an effort to discuss settlement. In Gulyas' October 20, 2001 email to Defendant's owner, Michael Eikenberry, he states that he has received "advice of our attorney" and that Eikenberry "will be contacted to settle this matter." In an October 22, 2001 email to Gulyas, Eikenberry responds in part by asking:

> What do you feel is fair? Should we continue commission payments for 2 months, a year, until the parts go dead or what? Only you know what efforts you have put into your sales efforts over the last several years. . . . We don't want to fight Steve. . . . You tell us what you think is fair and what you can live with either through your attorney or whatever.

(PX 14.) The court agrees that this exhibit is properly excluded under Rule 408.

Thereafter, the tone and content of the parties' correspondence is not so clearly aimed at settlement. Many of the documents are "not conciliatory but argumentative," with each party stating its case and questioning the other side's actions, motives, and positions. Motorola, Inc. v. DBTel Inc., No. 02 C 3336, 2002 WL 1348849, at *1 (N.D. Ill. June 19, 2002). In a January 15, 2002 email to Eikenberry, for example, Gulyas writes:

> [Y]ou know you cannot dispute I brought in as customers UTA (Lear), Desa (Patco), ITW (Fastex Nexus etc.) Alcoa, AFL, yazaki, ITT, Saturn Elec., Chata, Huck, Capsonic, ET&B, Auto Kabel, Budd, Amesa, Appleton, ITW buildex. You agree and

3

you[r] brother concours [sic] this is the case. You paid commissions and obviously agree that these are my customers. Why have commissions stopped???? Do you agree with me and your brother??? I have worked hard. Are your commissions up to date??? Try looking into Nexus just for fun. Why won't you pay now on my customers???? I have been more than patient.

(PX 16.) Eikenberry similarly responds to Gulyas on January 20, 2002:

> I really don't know what your problem is . . . I forwarded your e-mail to Doug, Jim and Cindy, as I will this one, maybe they can figure it out. Like I have said before as far as I know you are receiving commissions for sales to those customers you mentioned. Also as I said you are welcome to come to my office and look at invoices for yourself.

(PX 16A.)

Eikenberry does express in several of his emails that he does not want to fight with Gulyas, and that he is sending Gulyas commission payments even though he does not agree Gulyas is owed any money. In the first of those emails dated January 12, 2002, it is not clear that Eikenberry is offering to compromise or settle Gulyas' dispute, as opposed to merely questioning Gulyas' understanding of the terms of the underlying oral sales representative agreement:

> I told you before "I don't want to fight with you." I told you "if you honestly think we should pay you commissions for the life of the parts, you can take those checks and still look at yourself in the mirror every morning when you shave, then I can send them to you." Where's the problem? Having trouble with that?

(PX 15.)

In two subsequent emails, Eikenberry reiterates that he will continue to send Gulyas money "because I said I would" and "not because we feel obligated." (PX 16A, 19, 20.) Viewed in context, however, Defendant has not made a "substantial showing" that these statements demonstrate Eikenberry's intent to compromise the parties' dispute. In his January 20, 2002 email, Eikenberry states:

> THE ONLY THING I AM DOING WRONG IS SENDING YOU MONEY. I AM DOING IT BECAUSE I SAID I WOULD AND I DON'T WANT TO FIGHT WITH YOU. IF WHAT WE ARE SENDING IS NOT ENOUGH THEN APPARENTLY THE SALES AREN'T WHAT YOU THINK THEY ARE. YOU HAVE BEEN SO OUT OF TOUCH THAT YOU DON'T EVEN KNOW WHAT'S GOING ON WITH "YOUR CUSTOMERS." COULD THAT BE WHY YOU WERE FIRED?

(PX 16A.) In a February 17, 2002 email to Gulyas, Eikenberry again states:

> We are paying you, as I said we would, for the existing parts and will continue to do so. We are doing this because we don't want to fight with you not because we feel obligated. No one knows how long the parts will be around so how can we pay you a cash price even if we wanted to????

(PX 19.) It is not clear from either statement that Defendant agreed to pay, or in fact paid, anything less than SJG's full demand under the terms of the sales representative agreement. As the Advisory Committee Note to Rule 408 explains, the relevancy of an offer as proof of liability or amount of a claim "will vary as the amount of the offer varies in relation to the size of the claim and may also be influenced by other circumstances." FED. R. EVID. 408, Advisory Committee Notes. That is, "relevancy concerns could not exclude proof that a party offered to pay nine-tenths of a claim against him, for he would likely make such an offer only if he did believe the claim was a strong one." Christopher B. Mueller and Laird C. Kirkpatrick, FEDERAL EVIDENCE § 135, at 88 (2d ed. 1994).

Eikenberry testified at his deposition that "[w]e were sending – we continued to him – we were trying to negotiate a settlement with Steve, sort of a severance package type of deal. We were attempting to avoid litigation. That's why we continued sending him commissions; not because we felt we owed him, because we didn't." (Eikenberry Dep., at 107.) None of the pay stubs, however, indicate that Defendant is paying SJG as part of a settlement or compromise agreement. (PX 39-43.) Nor does Defendant suggest in any of the documents that the commission payments will end once the parties have fully resolved SJG's claims. To the contrary, by April 29, 2003, Eikenberry was sending an apologetic email message to Gulyas regarding late commission payments:

> Sorry for the delay in payments. As you know the economy is depressed which hurts everyone and slows payments. Our receivables are suffering as well and some of the "payments" you say are past due are past due to us as well. We do not pay "commissions" on anything we have not been paid for.

\* \* \* \*

> Please accept our humble apologies and we should be back on track as the economy improves.

(PX 33.) Nothing in this email message establishes that Defendant intends to be "back on track" with its settlement payments as opposed to payments due under the terms of the sales representative agreement. Indeed, there is no indication that the parties ever reached a settlement agreement. (See Order of 12/1/05, Doc. 60 (denying SJG's request for leave to amend complaint to add an action to enforce a settlement agreement where Defendant denied the existence of such an agreement and SJG made a judicial admission that no settlement agreement was ever reached).)

Gulyas and Eikenberry do reference an "agreement" in some of their emails, but again it is not clear whether they mean the sales representative agreement or some other agreement to compromise. In his January 12, 2002 email, for example, Eikenberry states:

> From this point on I will be sending the checks registered mail and deducting the postage from them. The agreement doesn't include postage. We will no longer be doing your accounting for you either without charge.

(PX 15.) (See also PX 19 ("Please keep in mind also that our agreement has always been that you would not rep another molder that could be a competitor to us with our customers. So doing would break our agreement.")) Gulyas' January 25, 2002 email similarly demands:

> [N]ot getting southwest statements also commissions are not right per agreement and are trying to be hidden. am too busy to deal with this. Nexus commission not paid from April sent out info heard nothing . . . . .

(PX 16B.)

Based on the existing record, the court declines to exclude in limine Plaintiff's Exhibits 14A through 43 as inadmissible settlement negotiations. Defendant has not made a substantial showing that its continued payment of the commissions demanded by SJG was part of a settlement agreement. Defendant may have wanted to avoid or delay a lawsuit by continuing to perform under

the sales representative agreement, but it has not met its burden of establishing that the payments constituted offers to compromise.

II.     **Motion to Exclude Evidence of Oral Contract with Lifetime Duration**

Defendant also seeks to exclude evidence that the parties entered into an oral contract to pay commissions for the "life of the part." SJG claims that Defendant agreed to pay commissions on all parts sold to SJG clients "[a]s long as those parts continue to run." (Pl. Resp., at 1.) Defendant insists that any such agreement would violate the Illinois Statute of Frauds, which precludes enforcement of a services contract that cannot be performed within one year "unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith." 740 ILCS 80/1. *See also Fischer v. First Chicago Capital Markets, Inc.*, 195 F.3d 279, 283 (7th Cir. 1999).[1] In Defendant's view, "there simply can be no enforceable contract for commissions into perpetuity absent a written contract providing 'very specific and clear language to that effect.'" (Def. Motion, at 5 (quoting *Lippert Marketing, Ltd. v. Kingwood Ceramics, Inc.*, No. 95 C 6490, 1998 WL 699023, at *17 (N.D. Ill. Oct. 5, 1998) (declining to adopt "an interpretation of the [sales representative] agreement which would compensate [the plaintiff] in perpetuity" absent clear language to that effect).)

SJG argues that the Statute of Frauds is inapplicable here because Defendant continued to pay commissions for over two years after terminating Gulyas as a sales representative. (Pl. Resp., at 1.) In support of this proposition, SJG cites *United States, for Use of Argyle Cut Stone Co. v. Paschen Contractors, Inc.*, 664 F. Supp. 298 (N.D. Ill. 1987), in which the court stated:

> It is elementary contract law that an agreement too indefinite and vague for enforcement may be made definite by performance. *Smithereen Co. v. Renfroe*, 325 Ill. App. 229, 59 N.E.2d 545 (1945); *Arthur Rubloff & Co. v. Leaf*, 347 Ill. App.

---

[1]     The parties stipulate that Illinois law governs this lawsuit.

7

191, 106 N.E.2d 735, 737 (1952), and the performance of a contract takes it out of the statute of frauds. *Pearce v. Pearce*, 184 Ill. 289, 56 N.E. 311 (1900).

*Id.* at 302. Unlike this case, however, *Paschen Contractors* did not involve a claim for lifetime commissions. Rather, the plaintiff sought payment of a discrete amount for the labor and material it had provided for a construction project. *Id.* at 300.

Illinois courts have not yet addressed contracts contemplating commission payments for the "life of a part." SJG directs the court to *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498 (6th Cir. 1995), in which Kingsley Associates had represented National Lock Corporation's PlastiCrafters Division ("National Lock") as its independent sales representative specializing in promoting and selling manufacturers' component parts to the automobile industry. *Id.* at 501-02. Kingsley and National Lock both agreed that they had an oral agreement to pay commissions for the "life of the part," meaning that "after Kingsley made an initial sale of a component part to an automobile company, it would receive commissions on all future sales of that part to that company, even if Kingsley was terminated as sales representative." *Id.* at 502.

Moll PlastiCrafters subsequently acquired National Lock and assumed its contracts. Moll PlastiCrafters initially kept Kingsley on as a sales representative but later terminated its employment. At that time, a dispute arose as to whether Moll PlastiCrafters had assumed National Lock's obligation to pay the plaintiff for the "life of the part." *Id.* at 502-03. A jury determined that it had, but the district court disagreed and entered judgment in favor of Moll PlastiCrafters. The Sixth Circuit reversed the district court, finding "sufficient evidence by which the jury could have reasonably determined that Kingsley had an implied-in-fact contract with Moll PlastiCrafters requiring commissions to be paid for the life of the part regardless of whether Moll PlastiCrafters terminated Kingsley as its sales representative." *Id.* at 504. The court found evidence of a "mutual understanding" between the parties based on testimony from several management employees that they were aware of the "life of the part" agreement. *Id.*

Even absent such evidence, the court stressed, the owners of Moll PlastiCrafters, George Votis and Richard Fackler, continued to pay Kingsley commissions on parts sales it made prior to the acquisition. "The jury could have reasonably determined that since Moll PlastiCrafters continued to pay Kingsley commissions on parts initially sold to manufacturers prior to the acquisition, Votis and Fackler must have known that its obligation to pay sales commissions would continue as long as Moll PlastiCrafters continued to sell the parts represented by the initial sale." *Id.* at 505. As the court explained, "[c]ontinuing to pay Kingsley commissions not only reflects Moll PlastiCrafters' knowledge of a continuing obligation to pay commissions after sales are made but also an assent to these terms." *Id.* at 506.

Contrary to SJG's suggestion, the *Kingsley* court did not recognize an automobile industry custom or practice to pay sales commission for the life of a part. The court merely noted that Kingsley asserted the existence of such a custom. *Id.* at 502 n.5. *Compare also Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 177 n.1 (6th Cir. 1996) (stating that "'[l]ife of the part' commissions are *apparently* a fairly common practice in the manufacturer's representative business.") (emphasis added). Nor did the court address the statute of frauds, at issue here. Defendant correctly notes that under Illinois law, partial performance is rarely indicative of a contract's terms. (Def. Reply, at 3-4.) As a result, "in most cases of partial performance of a contract subject to the statute of frauds the performer is remitted to his (noncontractual) remedy in quantum meruit for the value of his performance." *Consolidation Servs., Inc. v. KeyBank Nat'l Ass'n*, 185 F.3d 817, 821 (7th Cir. 1999). Here, however, SJG alleges complete performance:

> the statute of frauds is no barrier to a suit by an employee who has rendered services under an unwritten contract and seeks payment for those services, even though the contract called for a payment schedule which would take more than a year. *McIntosh[ v. Magna Sys., Inc.]*, 539 F. Supp. [1185,] 1190 [(N.D. Ill. 1982)]; *Collins v. Addicks*, 351 Ill. App. 266, 270, 114 N.E.2d 801, 803 (2d Dist. 1953). That principle includes a salesman's claim for a commission or bonus when he has performed the services necessary to earn it, but under the terms of the contract the amount of the commission hinges on later events and determinations. *Reiss v. El Bauer Chevrolet Co.*, 96 Ill. App. 2d 266, 269, 238 N.E.2d 619, 621 (4th Dist. 1968).

9

*David S. Lapine, Inc. v. H.B. Erickson Corp.*, No. 85 C 9939, 1987 WL 9592, at *4 (N.D. Ill. Apr. 13, 1987) (denying summary judgment on plaintiff's "salesperson's action for commissions already earned and merely to be reckoned and paid later.")

The court agrees that SJG cannot argue merely that it had an oral contract for lifetime commissions to the extent that such an arrangement implies lifetime employment. SJG may, however, present evidence that there is an industry custom to pay commissions for the "life of a part"; that the parties agreed and intended for SJG to be compensated on that basis; and that Gulyas performed fully under the agreement and is entitled to post-termination commissions. *See, e.g., Harold Wright Co. v. E.I. DuPont De Nemours & Co.*, 49 F.3d 308, 310 (7th Cir. 1995) (denying summary judgment where "[m]aybe there is a custom in the fishing-products trade that would allow Wright to claim commissions on orders that it can show grew out of its marketing efforts" or "[m]aybe the negotiating history of the contract between Wright and Du Pont can illuminate the parties' intentions with respect to orders shipped after the end of the contract.")

## CONCLUSION

For the reasons stated above, Defendant's motion in limine to bar use of settlement discussions and settlement payments [Doc. 68] is granted as to Plaintiff's Exhibit 14 but otherwise denied. Defendant's motion in limine to exclude evidence of oral contract with lifetime or perpetual duration [Doc. 70] is denied except as stated in this opinion.

ENTER:

Dated: May 2, 2006

*Nan R. Nolan*
NAN R. NOLAN
United States Magistrate Judge